UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
SEP 10 2018
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

WILLIAM JAY SHARP,

           Plaintiff,

v.

ALLY FINANCIAL, INC.,

           Defendant.

**DECISION AND ORDER**

6:15-CV-06520 EAW

## **INTRODUCTION**

Plaintiff William Sharp ("Plaintiff") asserts claims against defendant Ally Financial, Inc. ("Defendant") pursuant to the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA"), and New York State common law, alleging that he received hundreds of harassing telephone calls from Defendant's representatives regarding an automobile loan obtained from Defendant. (Dkt. 1 at 3). Plaintiff, diagnosed with stage four cancer, contends that Defendant continuously contacted him by telephone to harass him about his debt, causing great emotional distress. (*Id.* at 4-5). Plaintiff died during the pendency of these proceedings. (Dkt. 28). As a result, Kathleen J. Majewski ("Majewski"), who has been appointed the Administratrix of Plaintiff's Estate, seeks to be substituted as party plaintiff in this action. (Dkt. 30).

Presently before this Court are Defendant's motion for summary judgment (Dkt. 26), Plaintiff's motion to substitute (Dkt. 30), Plaintiff's motion for leave to file a supplemental response to Defendant's supplemental memorandum (Dkt. 47; *see* Dkt. 40),

Plaintiff's motion to seal (Dkt. 48), Plaintiff's motion for leave to cite additional authority (Dkt. 51), and Defendant's motion for leave to file supplemental authority (Dkt. 53). Because Plaintiff's TCPA claim did not abate upon his death, and for the additional reasons discussed below, Defendant's motion for summary judgment is denied, Plaintiff's motion to substitute is granted, Plaintiff's motion for leave to file a supplemental response is denied, Plaintiff's motion to seal is denied, Plaintiff's motion for leave to cite additional authority is granted, and Defendant's motion for leave to file supplemental authority is granted.

## BACKGROUND

On January 5, 2013, Plaintiff obtained an automobile loan from Defendant. (Dkt. 26-2 at ¶ 1; Dkt. 29-1 at ¶ 1). In October of 2014, Plaintiff was diagnosed with stage four esophageal cancer. (Dkt. 29-9 at 3-4:11-13). Plaintiff began chemotherapy a week after his diagnosis (*id.* at 4:13), and this treatment lasted until about June 2015 (*id.* at 5:20). Plaintiff could no longer work while he received treatment, and he primarily relied upon social security disability insurance payments for income. (*Id.* at 4:14-16). Soon thereafter, Plaintiff fell behind on his loan payments and notified Defendant of his financial circumstances. (*Id.* at 4-5:16-17).

Beginning in January 2015, Plaintiff was informed that his cancer had spread to his brain, and he began receiving treatment for brain tumors. (*Id.* at 6:21-22). During that same month, Plaintiff called Defendant to negotiate alternative payment terms, and informed Defendant that he had cancer and was undergoing "chemotherapy and radiation treatment." (*Id.* at 6-7:23-25).

Plaintiff received telephone calls several days a week regarding his debt. (*See id.* at 7:25-26). Plaintiff testified that the frequent calls would "really irritate" him and made him "feel even worse." (*Id.* at 7:27). The calls made him "emotionally stressed" and caused him to "cry[] more" and to "worry[] more." (*Id.*). Plaintiff also testified that Defendant's representatives told him that "if [he] fell behind, that they'd repossess the car." (*Id.* at 8:30). Plaintiff used the automobile to go to the "hospital on a semi-daily, semi-weekly basis." (*Id.* at 5:17).

In June 2015, Plaintiff filed a complaint with the New York State Office of the Attorney General ("NYSOAG"), claiming that he had received 24 calls within an 80-minute period on June 19, 2015. (*Id.* at 9:34; *see* Dkt. 29-6 (NYSOAG complaint)). From that point forward, the calls began to subside, and, on July 23, 2015, Defendant issued a letter to Plaintiff, apologizing for the number of calls that had been made by one of its representatives. (Dkt. 29-9 at 9:34-35; *see* Dkt. 29-7 (Defendant's letter)). Plaintiff testified that the calls ceased by July 2015. (Dkt. 29-9 at 16:88).

## PROCEDURAL HISTORY

Defendant moved for summary judgment, arguing two legal issues. First, Defendant contends that the TCPA claim should be dismissed because it abated upon Plaintiff's death. (Dkt. 26-1 at 2-5).[1] In making this argument, Defendant relies primarily upon the decision in *Hannabury v. Hilton Grand Vacations Co., LLC*, 174 F. Supp. 3d 768 (W.D.N.Y. 2016). The *Hannabury* court held that a consumer's private right-to-action

---

[1]     A Suggestion of Death was filed on August 23, 2016. (Dkt. 28).

under § 227(b)(3) and § 227(c)(5) of the TCPA is "penal" in nature, and thus, it extinguishes upon the party's death. *Id.* at 776. Second, Defendant argues that Plaintiff's intentional infliction of emotional distress ("IIED") claim must be dismissed because Plaintiff was not verbally abused or otherwise threatened by Defendant, and the only harassing conduct alleged consists of the telephone calls themselves. (Dkt. 26-1 at 5-7). In support, Defendant relies heavily upon the Second Circuit's decision in *Conboy v. AT&T Corp.*, 241 F.3d 242 (2d Cir. 2001), which held that "numerous telephone calls from debt collectors" did not constitute "extreme and outrageous" conduct where the plaintiffs were "not physically threatened, verbally abused, or publicly humiliated in any manner." *Id.* at 258-59.

Plaintiff opposes Defendant's summary judgment motion, arguing that *Hannabury* was wrongly decided, and that this Court should hold that the private right-to-action under the TCPA is primarily remedial in nature. (Dkt. 29 at 5-12). Plaintiff also argues that questions of fact preclude summary judgment on his IIED claim because the instant matter involves many more telephone calls than those observed in *Conboy*, and the fact that Defendant continued to make these calls after discovering that Plaintiff suffered from terminal cancer raises a question of fact as to whether the conduct was sufficiently "outrageous." (*Id.* at 12-16).

Defendant subsequently filed a motion seeking leave to file a supplemental memorandum in support of its motion for summary judgment. (Dkt. 40). Defendant argues that the Second Circuit's decision in *Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51 (2d Cir. 2017) requires that Plaintiff's TCPA claim be dismissed. (Dkt. 40-2 at 2-4). In *Reyes*,

the Second Circuit held that "the TCPA does not permit a party who agrees to be contacted as part of a bargained-for exchange to unilaterally revoke that consent." 861 F.3d at 56. Defendant argues that Plaintiff consented to the receipt of the telephone calls at issue in this case, and that he never appropriately revoked that consent. (Dkt. 40-2 at 3-4). In opposition, Plaintiff argues that this Court should decline to follow *Reyes* because it will likely be reversed *en banc* by the Second Circuit or be overturned by the Supreme Court. (Dkt. 42 at 2-3). Plaintiff also opposes the application of *Reyes* at this point in the litigation because discovery has not yet concluded, and Plaintiff has not had the opportunity to acquire information necessary to effectively confront this new argument. (*Id.* at 4-6).

Plaintiff subsequently filed a motion for leave to file a supplemental response to Defendant's supplemental memorandum. (Dkt. 47). Plaintiff argues that the holding in *Reyes* is inapplicable to the instant matter because the nature of the credit applications involved in securing his automobile loan, as well as the terms of the retail installment contract, indicate that he did not consent to the calls at issue in this case as part of a bargained-for exchange. (Dkt. 47-1). Defendant opposes the motion for leave to file a supplemental response, arguing that Plaintiff did not raise any of these arguments in his initial opposition papers. (Dkt. 49 at 3-4). In addition, Defendant argues that the credit applications involved in this matter are considered contracts under New York State law and Second Circuit precedent, and that the retail installment contract did not contain an integration clause; thus, *Reyes* remains applicable to this case. (*Id.* at 4-5). Plaintiff has submitted reply papers opposing the arguments Defendant asserts in its response. (Dkt.

50). Plaintiff has also filed a motion to seal in connection with several documents submitted in support of his motion for leave to file a supplemental response. (Dkt. 48).

On August 15, 2018, Plaintiff filed a motion for leave to cite additional authority, requesting that this Court review the Sixth Circuit's recent decision in *Parchman v. SLM Corporation*, 896 F.3d 728 (6th Cir. 2018) in determining whether his TCPA claim abated upon his death. (Dkt. 51). Defendant opposes the motion, arguing that Plaintiff's reliance upon *Parchman* is inapposite and futile. (Dkt. 55).

On August 16, 2018, Defendant filed a motion for leave to file supplemental authority, requesting that the Court consider the decisions in *Harris v. Navient Sols., LLC*, No. 3:15-CV-564 (RNC), 2018 WL 3748155 (D. Conn. Aug. 7, 2018) and *Few v. Receivables Performance Mgmt.*, No. 1:17-CV-2038-KOB, 2018 WL 3772863 (N.D. Ala. Aug. 9, 2018) in reviewing Defendant's arguments related to the application of *Reyes*. (Dkt. 53). Plaintiff opposes Defendant's motion, arguing that the cases supplied by Defendant are irrelevant and do not provide any additional bases justifying the application of *Reyes* to the facts of this matter. (Dkt. 56).

## DISCUSSION

The parties dispute whether the TCPA claim extinguished upon Plaintiff's death. Defendant's first argument in its motion for summary judgment is that Plaintiff's TCPA cause of action extinguished upon Plaintiff's death, and that this claim should not be permitted to proceed upon the substitution of a new party plaintiff. (Dkt. 26-1 at 2-5). Because the Court cannot rule upon Majewski's motion to substitute in regards to the TCPA claim without also determining Defendant's first argument in its motion for

summary judgment, the Court will address Defendant's motion for summary judgment before turning to Plaintiff's motion to substitute.

## I.  Defendant's Motion for Summary Judgment: The TCPA Claim

### A.  Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the 'evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.'" *Rowe v. Wal-Mart Stores, Inc.*, 11 F. Supp. 2d 265, 266 (W.D.N.Y. 1998). Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### B. Plaintiff's TCPA Claim is "Remedial" and Has Not Extinguished Upon Plaintiff's Death

"The Federal Rules, rather than state-law principles, govern the procedure for substitution following a party's death, even where the court must apply state substantive law." *Graham v. Henderson*, 224 F.R.D. 59, 63 (N.D.N.Y. 2004) (citing *Servidone Constr. Corp. v. Levine*, 156 F.3d 414, 416 (2d Cir. 1998)). "If a party dies and the claim is not extinguished, the court may order substitution of the proper party." Fed. R. Civ. P. 25(a)(1).

"Whether a claim survives or is 'extinguished' upon the death of a party is determined by 'the nature of the cause of action for which the suit is brought.'" *U.S. ex rel. Colucci v. Beth Isr. Med. Ctr.*, 603 F. Supp. 2d 677, 680 (S.D.N.Y. 2009) (quoting *Ex parte Schreiber*, 110 U.S. 76, 80 (1884)). "Absent some specific direction by Congress, whether an action created by federal statutory law survives the death of the plaintiff is a matter of federal common law." *Estwick v. U.S. Air Shuttle*, 950 F. Supp. 493, 498 (E.D.N.Y. 1996). "In general, under the federal common law, 'a claim survives a party's death if it is "remedial" rather than "punitive."'" Unfortunately, the law with respect to which claims fall on which side of the remedial/punitive line is not a model of clarity." *S.E.C. v. Wyly*, 860 F. Supp. 2d 275, 276 (S.D.N.Y. 2012) (quoting *Epstein v. Epstein*, 966 F. Supp. 260, 260 (S.D.N.Y. 1997)); *see Epstein*, 966 F. Supp. at 261 ("[A]s the Supreme Court has had repeated occasion to observe in recent years, terms like 'remedial' and 'punitive' are neither self-defining nor mutually exclusive." (citing *United States v. Ursery*, 518 U.S. 267, 277 (1996))). Indeed, it has been stated that "[t]he use of labels such as

'penal' or 'remedial' is . . . unsatisfactory unless it is recognized as a shorthand way of expressing relevant considerations." *Derdiarian v. Futterman Corp.*, 223 F. Supp. 265, 271 (S.D.N.Y. 1963) (stating that "the statutes relied on here are meant to deter bad practices in the sale of securities, as well as to afford compensation to persons injured thereby").

> Courts look to three factors to determine whether a civil action brought under a statute is penal or remedial for purposes of survivability: "(a) whether the purpose of the action is to redress individual wrongs or wrongs to the public; (b) whether the recovery runs to the individual or the public; and (c) whether the recovery is disproportionate to the harm suffered."

*Hannabury*, 174 F. Supp. 3d at 774 (quoting *Estwick*, 950 F. Supp. at 498).

### 1.    The Legislative History of the TCPA

"The language of a statute itself and its legislative history may be instructive in determining whether the statute is remedial or penal." *U.S. ex rel. Estate of Botnick v. Cathedral Healthcare Sys., Inc.*, 352 F. Supp. 2d 530, 532 (D.N.J. 2005); *see Epstein*, 966 F. Supp. at 260 ("Neither the statutory language nor the legislative history of the [relevant statute] specifically addresses whether a private civil claim survives a party's death."). The legislative history of the TCPA indicates that the statute was meant to serve both "remedial" and "penal" purposes.

The TCPA was intended "to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile ([f]ax) machines and automatic dialers." S. Rep. No. 102-178 at *1 (1991). The personal cost to individual victims of the abusive use of automated calling systems was another driving

force behind the enactment of this statute. *See id.* at \*13 ("When a person uses a voice recording system from the telephone company, *the person often is required to pay for every message that is recorded*. The amount of the payment often varies depending on the length of the call." (emphasis added)). The Senate Report also described the bill as a mechanism "to *ban* artificial or prerecorded messages to residential consumers and to emergency lines, and to place restrictions on unsolicited advertisements delivered via fax machine." *Id.* at \*3 (emphasis added).

Many of the passages found within the House Report reflect an intent to redress individual harms. *See, e.g.*, H.R. Rep. No. 98-1037 at \*6 (1991) (noting that the bill was "designed to return a measure of control to both individual residential telephone customers and owners of facsimile machines."). The bill sets forth rulemaking requirements that would consider *both* "the most cost effective methods for preventing abuses" and the "costs incurred by recipients." *Id.* To the latter consideration, the House Report stated that "[o]nce a phone connection is made, automatic dialing systems can 'seize' a recipient's telephone line and not release it until the prerecorded message is played, even when the called party hangs up." *Id.* at \*10. In addressing facsimile advertisers, the House Report noted that the design of a fax machine required the recipient to bear some of the costs associated with a transmission, and that such advertisements could render a machine "unavailable for legitimate business messages while processing and printing junk fax." *Id.*; *see also id.* at \*25 (noting that "*the recipient* assumes both the cost associated with the use of the facsimile machine and[] the cost of the expensive paper used to print out facsimile messages[,] . . . regardless of their interest in the product or service being advertised."

- 10 -

(emphasis added)). The House Report also indicated that automatic telephone dialing systems may "seiz[e] the telephone lines of public emergency services, dangerously preventing those lines from being utilized to receive calls *from those needing emergency services*." *Id.* at *24 (emphasis added).

While recognizing that "unsolicited commercial telemarketing calls are a widespread problem," the House and Senate Reports focused on the personal frustrations and invasion of privacy experienced by individual consumers in the receipt of these calls. *Id.* at *18; *see* S. Rep. 102-178 at *9 ("The reported bill will result in a significant benefit in protecting the personal privacy of residential telephone subscribers. The evidence gathered by the Committee indicates that a substantial proportion of the public believes that these calls are a nuisance and an invasion of one's privacy rights in the home."); *see also* H.R. Rep. No. 98-1037 at 24 ("[C]*ustomers who pay additional fees* for cellular phones, pagers, or unlisted numbers are inconvenienced and even charged for receiving unsolicited calls from automatic dialer systems." (emphasis added)); *Becker v. Comput. Scis. Corp.*, 541 F. Supp. 694, 702 (S.D. Tex. 1982) (noting that a statute was "more remedial than penal," where it "serve[d] the dual purpose of providing a remedy for the unauthorized intrusion into an individual's privacy while serving to deter wrongful conduct by penalizing those who violate its provisions"). Accordingly, while the Senate and House Reports evince a congressional design to deter a societal harm, the TCPA's foundations emphasize the importance of remedying individual wrongs inflicted by these undesirable business practices.

Furthermore, during a Senate proceeding held on November 7, 1991, the TCPA sponsor, Senator Hollings, proposed a "substitute amendment" to the TCPA to "address[] an enormous public nuisance." 137 Cong. Rec. S16204-01 at *2 (daily ed. Nov. 7, 1991) (statement of Sen. Hollings). Senator Hollings discussed the "private right-of-action provision," noting that it "will make it easier for *consumers to recover damages* from receiving these computerized calls." *Id.* at *4 (emphasis added). In addition, the Senator believed that unless the provision was enacted to afford "consumers" an easier avenue "*to obtain damages* from those who violate this bill, these abuses will undoubtedly continue." *Id.* (emphasis added). These statements support the notion that while the desired effect of the TCPA's enactment was to diminish the occurrence of inimical telephone and facsimile practices in general, the primary purpose of the TCPA's private right-to-action provision was to remedy the wrongs inflicted upon individual consumers.

## 2. The TCPA, Like Most Modern Consumer Protection Statutes, Serves Both Remedial and Penal Purposes

The TCPA's legislative history reveals that the statute was intended to serve dual purposes. On one hand, it is clear that Congress enacted the TCPA to address the personal frustrations and costs absorbed by the individual consumer. *See Destination Ventures, Ltd. v. F.C.C.*, 844 F. Supp. 632, 639 (D. Or. 1994) ("The TCPA . . . has the purpose of preventing the unfair shifting of advertising costs from the advertiser to the unwilling consumer."), *aff'd*, 46 F.3d 54 (9th Cir. 1995). The private right-to-action was included in the bill so that afflicted consumers could recover damages resulting from the nuisance of abusive telephone and facsimile practices, *see* 137 Cong. Rec. S16204-01, at *4; a

conclusion that suggests a more remedial character. On the other hand, it is equally apparent that Congress sought to deter undesirable and injurious business behaviors. *See Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162, 1166 (S.D. Ind. 1997) (finding that the $500 statutory damages remedy was intended to "effectively *deter* the unscrupulous practice of shifting [business interruption] costs to unwitting recipients of 'junk faxes'" (emphasis added)).

"Statutes giving a private action against the wrongdoer are sometimes spoken of as penal in their nature, but in such cases it has been pointed out that neither the liability imposed nor the remedy given is strictly penal." *Huntington v. Attrill*, 146 U.S. 657, 667 (1892); *see Murphy v. Household Fin. Corp.*, 560 F.2d 206, 211 (6th Cir. 1977) (holding that while the Truth in Lending Act served both remedial and penal purposes, "Congress focused on the individual consumer of credit as the person primarily injured who should be encouraged to prosecute actions and should be allowed to recover directly and adequately for harms done"); *see also Lowe v. Experian*, 340 F. Supp. 2d 1170, 1176 (D. Kan. 2004) ("[T]he [Fair Credit Reporting Act], like many federal statutes allowing a private cause of action, displays both penal and remedial characteristics."). Indeed, "most modern social welfare legislation" serves the "dual purpose of remedying harm to the individual and deterring socially inimical business practices." *Porter v. Household Fin. Corp. of Columbus*, 385 F. Supp. 336, 342 (S.D. Ohio 1974); *see Murphy*, 560 F.2d at 211 (finding that "[t]he Truth in Lending Act ultimately serves the dual purpose of providing a remedy for harm to the monetary interests of individuals while serving to deter socially undesirable lending practices"); *see also Derdiarian*, 223 F. Supp. at 271 ("Quite clearly

the statutes relied on here are meant to deter bad practices in the sale of securities, as well as to afford compensation to persons injured thereby."). "While other courts have also acknowledged the dual remedial and penal nature of penalties assessed under consumer protection statutes, those courts have often found those penalties to be remedial, not penal, in nature." *F.T.C. v. Capital City Mortg. Corp.*, 321 F. Supp. 2d 16, 22 (D.D.C. 2004) (citing *Citronelle-Mobile Gathering, Inc. v. O'Leary*, 499 F. Supp. 871, 887 (S.D. Ala. 1980) (finding that while the relevant statute had the "dual purpose" of "remedying harm to the individual" and "deter[ing] prohibited business practices for the good of the general public," the statute's "purpose is not primarily punishment for an infraction of a public law"), *aff'd as modified sub nom. Citronelle-Mobile Gathering, Inc. v. Edwards*, 669 F.2d 717 (Temp. Emer. Ct. App. 1982)).

### 3. The Three Survivability Factors and the *Hannabury* Decision

#### a. The Primary Purpose of the TCPA Private Right-to-Action is to Redress Individual Wrongs

Plaintiff argues that *Hannabury* was wrongly decided because the TCPA is a remedial statute. About 18 months ago, the Second Circuit expressly endorsed the remedial nature of the TCPA in the context of pleading requirements. *See Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92, 96 (2d Cir. 2017) ("'Because the TCPA is a remedial statute, it should be construed to benefit consumers.'" (quoting *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013))). However, this Court is reluctant to view that single statement as determinative of whether a TCPA private right-to-action claim is "penal" or "remedial" for purposes of survivability. *See Schimpf v.*

*Gerald, Inc.*, 2 F. Supp. 2d 1150, 1158 (E.D. Wis. 1998) (finding that "[a] multiple-damages provision's dual nature can result in it being considered more like a compensatory remedy" for some purposes, "while being considered more like a penalty" for others); *Lincoln Nat. Life Ins. Co. v. Silver*, No. 86 C 7175, 1990 WL 160037, at *4 (N.D. Ill. Oct. 15, 1990) (stating that where statutes contain "elements that are both penal and remedial[,] . . . depending on the context, a claim may be characterized one way or the other").

As noted by the *Hannabury* court, there is a divergence of authority on whether the TCPA is remedial or penal. *See Hannabury*, 174 F. Supp. 3d at 774; *compare US Fax Law Ctr., Inc. v. iHire, Inc.*, 362 F. Supp. 2d 1248, 1253 (D. Colo. 2005), *with Hartford Ins. Co. of the Midwest v. Meecorp Capital Mkts., LLC*, No. 10-CV-6441(DMC)(MF), 2012 WL 12905847, at *4-5 (D.N.J. Dec. 27, 2012), *and Hooters of Augusta, Inc. v. Am. Glob. Ins. Co.*, 272 F. Supp. 2d 1365, 1375 (S.D. Ga. 2003), *aff'd*, 157 F. App'x 201 (11th Cir. 2005); *see also Physicians Healthsource, Inc. v. Janssen Pharm., Inc.*, No. 12-2132 (FLW), 2013 WL 486207, at *4 n.3 (D.N.J. Feb. 6, 2013) ("[T]here is no general consensus amongst the districts as to the nature of TCPA.").

In applying the first of the three survivability factors, the *Hannabury* court determined that "the primary purpose of a private action under Section 227(b) and 227(c) of the TCPA is to redress wrongs to the public as opposed to individual plaintiffs." *Hannabury*, 174 F. Supp. 3d at 775. In reaching this conclusion, the *Hannabury* court relied upon the Supreme Court's decision in *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012), where—in its introductory statements—the Supreme Court noted that "[v]oluminous consumer complaints about abuses of telephone technology—for example,

- 15 -

computerized calls dispatched to private homes—prompted Congress to pass the TCPA." *Id.* at 370-71. However, *Mims* did not pertain to the issue before this Court—rather, it addressed simply "whether Congress granted state courts exclusive jurisdiction over private actions brought under the TCPA." *Id.* at 376.

The Supreme Court recited Senator Hollings's contempt for the types of telephone calls used to exploit individual privacy rights. *See id.* at 384. Specifically, Senator Hollings stated that "[c]omputerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. S16204-01 at *3; *see Hannabury*, 174 F. Supp. 3d at 775. While certainly a recognition of the rampant harm that may arise from unregulated computerized telephone calls, Senator Hollings's statement does little to support the notion that the TCPA is *primarily* intended to deter, rather than to remedy, the harms caused to individual consumers.

In any event, even if such intent could be discerned from that lone statement, the legislative history outlined above indicates that this statute was primarily concerned with remedying individual harms and providing incentives for consumers to pursue redress, while also deterring abusive telephone and facsimile practices. *See also Mims*, 565 U.S. at 385 ("[T]he views of a single legislator, even a bill's sponsor, are not controlling."). Indeed, just last month, the Sixth Circuit—in a matter of first impression for that Circuit— explicitly disagreed with *Hannabury* and held "that claims under the TCPA are best characterized as remedial," and thus, such claims "do survive a plaintiff's death."

*Parchman v. SLM Corp.*, 896 F.3d 728, 740-41 (6th Cir. 2018). In analyzing the first abatement factor, the *Parchman* court stated that simply because "the harm is widely shared does not mean it is a general public wrong[, since t]hese are harms felt by identifiable individuals, as individuals[, and t]hey are not harms felt by the general public, as a community." *Id.* at 739. The Sixth Circuit also relied upon the same line of cases that this Court has cited above, which describe consumer protection statutes as primarily remedial in nature despite serving a concurrent purpose of redressing widespread social problems. *Id.* at 739-40.

The *Hannabury* decision also emphasized that the plaintiff did not seek "actual redress for an individual wrong." *Hannabury*, 174 F. Supp. 3d at 776. 47 U.S.C. § 227(b)(3)(B) provides that a private individual may maintain "an action to recover for *actual monetary loss* from such a violation, *or* to receive *$500 in damages* for each such violation, whichever is greater." (emphases added). The plaintiff in *Hannabury* did not request "actual damages" and premised his entire claim upon the statutorily fixed damages amount. *Hannabury*, 174 F. Supp. 3d at 776. Although the facts alleged by Plaintiff in the present case certainly appear more egregious than those at issue in *Hannabury*, and Plaintiff generally *alleges* "actual damages" in his complaint (Dkt. 1 at ¶ 1), the record facts do not indicate that any "actual monetary losses" were associated with the receipt of these phone calls. Instead, it appears that Plaintiff seeks the statutorily fixed damages amount of $500 per violation (*id.* at ¶ 39) and relies upon the mere fact that he received such calls for purposes of his TCPA claim. As such, the relief requested by Plaintiff is not vastly different from that sought by the plaintiff in *Hannabury*.

- 17 -

With that said, the TCPA's statutory damages provision is not strictly penal in character. In *Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876 (8th Cir. 2005), the Eighth Circuit construed § 227(b)(3)'s damages clause in the context of an insurance policy and acknowledged the various policy reasons that weighed against finding the statutory damages provision to be penal in that context. *Id.* at 881; *see Hannabury*, 174 F. Supp. 3d at 776 (noting that "in the insurance context, there are policy considerations at play that counsel against construing the TCPA as penal in nature"). The Eighth Circuit determined that the statutorily fixed damages were available "at least in part, [as] *an incentive* for private parties to enforce the Act." *Universal Underwriters Ins. Co.*, 401 F.3d at 881 (emphasis added). The Eighth Circuit stated, "[w]hether we view the fixed award as a liquidated sum for actual harm or an incentive for aggrieved parties to act as private attorneys general, or both, it is clear that the fixed amount serves more than purely punitive or deterrent goals." *Id.* Moreover, the fact that treble damages are "available separate from fixed damages *strongly* suggests that the fixed damages serve *additional* goals other than deterrence and punishment." *Id.* (emphases added); *see Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1311 (11th Cir. 2008) ("The TCPA provides for $500 statutory damages and for treble damages for willful or knowing conduct, which is an indication that the statutory damages were not designed to be punitive damages." (citation omitted)), *certified question answered*, 29 So. 3d 1000 (Fla. 2010); *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 404 (E.D. Pa. 1995) ("The [TCPA] provides for a *minimum* recovery of $500 for each violation as well as treble damages if the plaintiff can prove [a] willful or knowing violation. . . . The statutory remedy is designed to provide adequate incentive for

an individual plaintiff to bring suit on his own behalf." (citation omitted)); *see also Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 778 (11th Cir. 2011) ("[G]iven the relatively small amount of statutory damages available under the TCPA, trebling these damages appears to be a mechanism to encourage victims of unsolicited 'junk' faxes to file suit."); *see generally Cook County v. Chandler*, 538 U.S. 119, 131 (2003) ("In *qui tam* cases the rough difference between double and triple damages may well serve *not to punish*, but *to quicken the self-interest of some private plaintiff* who can spot violations and start litigating to compensate the Government, while benefiting himself as well." (emphases added)).

Senator Hollings noted that if an avenue for private redress was not provided to consumers, the abuses wrought by unregulated automated transmissions would "undoubtedly continue." *See* 137 Cong. Rec. S16204-01, at *4. While it may be inferred from this statement that deterrence was the primary goal of the statute, Senator Hollings also noted that the very purpose of the private right-to-action provision was to "make it easier for consumers *to recover damages* from receiving these computerized calls." *Id.* (emphasis added). As the cases cited above illustrate, statutorily fixed-damages provisions also constitute an incentive to litigate—especially where any "actual monetary losses" would likely be low—and are not of a purely punitive nature; rather, such statutory damages serve primarily as a mechanism to *achieve* the remedial purposes of the TCPA. *See Penzer*, 545 F.3d at 1311; *Underwriters Ins. Co. v.*, 401 F.3d at 881; *Forman*, 164 F.R.D. at 404.

Likewise, the availability of treble damages is not necessarily indicative of a "penal" character. To the contrary, treble damages provisions have frequently been construed as an additional incentive for individuals to seek redress of personal wrongs. *See, e.g.,* *Underwriters Ins. Co.*, 401 F.3d at 881; *Alea London Ltd.*, 638 F.3d at 778; *see Matter of Wood*, 643 F.2d 188, 193 n.12 (5th Cir. 1980) (stating that section 130 of the Truth in Lending Act "is not made penal by the fact that the statute allows cumulative recoveries as a vehicle for encouraging enforcement"); *see also Murphy*, 560 F.2d at 210 ("[T]he Supreme Court, [the Sixth Circuit,] and the courts of numerous other circuits have held a number of statutory schemes authorizing multiple recoveries and minimum recoveries greater than actual damages to be remedial and not to impose penalties where the wrong addressed by the statute is primarily a wrong to the individual." (citing *Porter*, 385 F. Supp. at 342 (collecting cases))); *see generally Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 376 (1973) (noting that the Truth in Lending Act "provides that the penalty assessed shall be twice the amount of the finance charge imposed, but not less than $100," but declining to give that section a penal character where "the civil penalty prescribed is modest and the prohibited conduct clearly set out in the regulation").

The *Hannabury* decision also discusses the fact that many of the cases that construed the TCPA as a remedial statute involved facsimile practices or dealt with insurance policies. *See Hannabury*, 174 F. Supp. 3d at 774-75. In particular, the *Hannabury* court viewed the facsimile cases as based on the absorption of "tangible costs in receiving the fax, namely, the paper and toner required for printing," and found that such costs were not present in the case of a phone call recipient. *Id.* at 775. The *Hannabury* court also

- 20 -

determined that the policy implications disfavoring a "penal" determination in the context of an insurance policy were not applicable to a case outside the insurance context. *Id.* at 774-75. However, the legislative history of the TCPA indicates that Congress was concerned with other costs and priorities beyond those associated with facsimile transmissions when it enacted the TCPA. *See Kenro, Inc.*, 962 F. Supp. at 1166 ("Congress was concerned with more than the cost of fax paper when it established the $500 statutory damages remedy."); *see also Parchman*, 896 F.3d at 739 n.4 ("It would be a mistake to limit [the] view of the harms associated with a violation of the TCPA to only actual monetary damages, because the harm from these calls is not so limited."). Notably, the Eighth Circuit concluded that Congress intended to enact a "remedial" mechanism into the statutory framework irrespective of the insurance policy at issue, *see Underwriters Ins. Co.*, 401 F.3d at 881, and the Sixth Circuit came to the same conclusion after analyzing the survivability of a TCPA claim in the context of autodialed and prerecorded phone messages, *Parchman*, 896 F.3d at 731-32, 740-41. As such, the Court does not find the *Hannabury* court's differentiation between facsimile communications and telephone calls, or its distinction between survivability and insurability, to be persuasive in determining the nature of the TCPA private right-to-action.

Finally, the Court notes that the *Hannabury* court relied on *US Fax Law Ctr., Inc. v. iHire, Inc.*, 362 F. Supp. 2d 1248 (D. Colo. 2005), which determined that TCPA claims were not assignable because, under Colorado law, the TCPA private right-to-action provision was penal in nature. *Id.* at 1253. The Colorado district court stated that "[c]ourts considering the TCPA have uniformly concluded it was enacted to address a public harm."

*Id.* In support of this proposition, the Colorado court cited a Western District of Texas case, which—much like this Court—noted that "the TCPA damages provision was not designed *solely* to compensate each private injury caused by unsolicited fax advertisements, but also to address and deter the overall public harm caused by such conduct." *Texas v. Am. Blastfax, Inc.*, 121 F. Supp. 2d 1085, 1090 (W.D. Tex. 2000) (emphasis added). *Am. Blastfax, Inc.* involved a due process challenge to the TCPA damages provision and does not offer much insight into the survivability of TCPA claims. However, despite *Am. Blastfax, Inc.*'s recognition of the dual compensatory and deterrent purposes of the TCPA, the Colorado court relied on it in *iHire* without explaining why the TCPA was, nevertheless, primarily "enacted to address a public harm."[2] *See also*

---

[2]     In a subsequent decision, the same Colorado District Court Judge referenced the first *iHire* decision, *see US Fax Law Ctr., Inc. v. iHire, Inc.*, 374 F. Supp. 2d 924, 928 (D. Colo. 2005) ("[The d]efendants contend that claims under the [Colorado Consumer Protection Act] are not assignable because the statute is penal in nature. I concluded this was true for the TCPA claim in this case." (citing *iHire, Inc.*, 362 F. Supp. 2d 1248)), *aff'd*, 476 F.3d 1112 (10th Cir. 2007). On appeal, the Tenth Circuit declined to address that portion of the district court's holding. *See US Fax Law Ctr., Inc. v. iHire, Inc.*, 476 F.3d 1112, 1120 (10th Cir. 2007) (declining "to address the district court's alternative holding that TCPA claims are unassignable because they are penal in nature" since the TCPA claims "are in the nature of personal-injury, privacy claims," and thus, are not assignable). The Tenth Circuit has since held that "the TCPA's statutory damages are penal *under Colorado law*." *Ace Am. Ins. Co. v. Dish Network, LLC*, 883 F.3d 881, 888 (10th Cir. 2018) (emphasis added); *compare Kruse v. McKenna*, 178 P.3d 1198, 1201 (Colo. 2008) (stating the test under Colorado law), *with Estwick*, 950 F. Supp. at 498 (stating the test under federal law). The Court notes that the Colorado Supreme Court has since had occasion to revisit *Kruse* and has overruled it to the extent that its holding was inconsistent with the plain language of Colorado's survival statute. *Guarantee Tr. Life Ins. Co. v. Estate of Casper by & through Casper*, 418 P.3d 1163, 1168-69 (Colo. May 29, 2018). While the Colorado Supreme Court has noted that the *Kruse* test may still be appropriate in certain contexts, it appears its usefulness has been limited to cases "where the intent of the legislature is not clear from the plain meaning of the relevant statutory text when viewed

*Parchman*, 896 F.3d at 738 ("[T]he primary purpose of the TCPA was to protect individuals from the harassment, invasion of privacy, inconvenience, nuisance, and other harms associated with unsolicited, automated calls."); *see generally Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) ("Congress sought to protect consumers from the unwanted intrusion and nuisance of unsolicited telemarketing phone calls and fax advertisements."); *Physicians Healthsource, Inc.*, 847 F.3d at 99 ("Congress undertook to limit the use in commerce of certain methods of communication that impose costs, hardships, and annoyances on unwilling recipients."). This Court is not persuaded by *iHire*. Not only is *iHire*'s holding based upon Colorado law, but it also provides no meaningful inquiry into the dual purposes served by a TCPA private right-to-action.

On balance, considering the various points set forth above, this Court concludes that the first factor weighs in Plaintiff's favor because the primary purpose of the TCPA private right-to-action provision is to redress individual wrongs. The Court recognizes that this conclusion differs from the *Hannabury* court's holding. While reasonable arguments can be made in support of each conclusion, for the reasons set forth above, this Court concludes that the purpose of the action is to redress individual wrongs, and thus the first survivability factor weighs in favor of a "remedial" determination.

### b.    Recovery Runs to the Individual

By its expressed language, the TCPA provides for recovery by the private "person," and thus, "any award of damages . . . goes to the recipient of the call, not the public."

---

in the context of the statutory scheme as a whole." *Rooftop Restoration, Inc. v. Am. Family Mut. Ins. Co.*, 418 P.3d 1173, 1176 (Colo. May 29, 2018).

*Hannabury*, 174 F. Supp. 3d at 776. Thus, as did the court in *Hannabury*, this Court concludes that the second factor in determining whether a TCPA private action is "penal" or "remedial" weighs in favor of a "remedial" determination. *See Parchman*, 896 F.3d at 740 ("As to the second factor, recovery under the statute runs to the harmed individual and not the public, suggesting TCPA claims are remedial.").

### c.    The Remedy is Disproportionate to the Harm

In applying the final factor, the *Hannabury* court emphasized that a $500 award may be granted for each and every violating phone call under the TCPA, which could be trebled to $1,500, and concluded that such recovery is "wholly disproportionate to the harm suffered." *Hannabury*, 174 F. Supp. 3d at 776. This Court agrees with that conclusion. Several courts have concluded that the amount of actual monetary loss arising from a TCPA violation is generally expected to be minimal. *See, e.g.*, *Alea London Ltd.*, 638 F.3d at 778; *Underwriters Ins. Co.*, 401 F.3d at 881; *Forman*, 164 F.R.D. at 404. Senator Hollings' statements on the Senate floor further confirm that the purpose of the private right-to-action provision is to provide an accessible remedy to encourage consumers to seek redress. *See* 137 Cong. Rec. S16204-01, at *4. This statutory scheme was designed with a damages provision that would inherently produce disproportionate recoveries in comparison to the harm inflicted in order to incentivize individual consumers to protect their rights. *See Hannabury*, 174 F. Supp. 3d at 776 ("The reality is that the TCPA's damages provision is specifically designed to be disproportional to the harm suffered; such disproportion both deters the violative conduct and 'encourage[s] victims to bring suit to redress violations.'" (quoting *Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network*,

*Inc.*, 300 F. Supp. 2d 888, 893 (E.D. Mo. 2004), *aff'd*, 401 F.3d 876 (8th Cir. 2005))); *see, e.g.*, *Kenro, Inc.*, 962 F. Supp. at 1166; *Forman*, 164 F.R.D. at 404. Accordingly, the Court concludes that recovery of damages of up to $1,500 per violation would be significantly disproportionate to the harm caused by a single telephone call, and thus, the third factor suggests that the private right-to-action claim is "penal" in nature. *See Parchman*, 896 F.3d at 740 (finding that "the treble damages provision is more likely disproportionate because it gives the court discretion to increase damages that, at $500 per call, are already greater than actual damages in most cases").

While the Court's analysis under the third factor indicates that the remedy afforded can be disproportionate to the harm inflicted, this conclusion does not outweigh the Court's determination that the first two factors suggest the TCPA private right-to-action is "remedial." Other statutory frameworks have been described as "remedial" despite having authorized multiple and minimum recoveries exceeding actual damages *See Malvino v. Delluniversita*, 840 F.3d 223, 230 (5th Cir. 2016) ("[T]he availability of treble damages under RICO does not prevent it from being classified as a remedial statute. The Supreme Court has 'repeatedly acknowledged that the treble-damages provision contained in RICO itself is remedial in nature.'" (quoting *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406 (2003))); *Murphy*, 560 F.2d at 210 (stating that the Truth in Lending Act is "not made penal by the fact that the statute allows cumulative recoveries as a vehicle for encouraging enforcement"); *see also Faircloth v. Finesod*, 938 F.2d 513, 518 (4th Cir. 1991) (stating that "civil RICO is a square peg, and squeeze it as we may, it will never comfortably fit in

the round holes of the remedy/penalty dichotomy," but concluding, nevertheless, that "the primary purpose of the private right of action created by RICO is remedial").

Furthermore, as the *Parchman* court noted, "the TCPA gives the court discretion to decide in each case whether and how much to increase damages." 896 F.3d at 740. This discretion "allows the court to evaluate the facts of a particular case and, perhaps, the harm caused to the plaintiff by the defendant's violations in determining the appropriate level of damages," *id.*, moderating the penal nature of the TCPA remedy. Indeed, to find this statutory framework to be penal in nature simply because one of its remedies permits a disproportionate recovery would undermine the dual purposes of the statute. *See SEC v. Brooks*, No. 07-61526-CIV, 2017 WL 3315137, at *7 (S.D. Fla. Aug. 3, 2017) ("Courts have concluded a statute is remedial in the abatement context even when the amount of damages appears disproportionate from the harm suffered if the overall purpose of the statute is intended to remedy a wrong to an individual as opposed to a wrong against the state."); *see also Hooters of Augusta, Inc.*, 272 F. Supp. 2d at 1376 ("Even were the trebling portion of § 227 considered to be penal in nature, this one factor cannot transform § 227 into a penal statute. To find otherwise would be to treat this one fact as dispositive thereby nullifying all the other indications that the statute is remedial."); *Citronelle-Mobile Gathering, Inc.*, 499 F. Supp. at 887 (noting that the "second factor, taken in the abstract, weighs in favor of characterizing this relief as penal," but holding that the Truth in Lending Act is remedial); *but see Int'l Cablevision, Inc. v. Sykes*, 172 F.R.D. 63, 69 (W.D.N.Y. 1997) (holding that a statute was penal in nature, despite the fact that the first two factors suggested the statute was "remedial," where there was no effort "on the part of [the]

plaintiff to demonstrate the actual damages it suffered, [and] the $10,000 minimum damages prescribed by the statute is disproportionate to the harm caused").

The decisions of other district courts, including decisions from the same district, are "relevant and persuasive." *Baldanzi v. WFC Holdings Corp.*, No. 07 Civ. 9551(LTS)(GWG), 2008 WL 4924987, at *3 (S.D.N.Y. Nov. 14, 2008). However, "the decisions of district courts, even those located within the same district, are not binding on other district courts." *Arculeo v. On-Site Sales & Mktg., LLC*, 321 F. Supp. 2d 604, 609 (S.D.N.Y. 2004), *aff'd*, 425 F.3d 193 (2d Cir. 2005). Accordingly, the Court declines to follow the rationale and the conclusion set forth in *Hannabury* to the extent discussed above, and holds that a private claim brought pursuant to § 227(b)(3) and § 227(c)(5) of the TCPA is primarily of a "remedial" nature, and thus, it did not extinguish upon Plaintiff's death. *See Parchman*, 896 F.3d at 740-41 (holding that the TCPA is a remedial statute and simply because it "'allows for accumulated recovery does not convert an otherwise remedial statutory scheme into a penal one'" (quoting *Murphy*, 560 F.2d at 210)).

Therefore, Defendant's motion for summary judgment is denied insofar as Defendant argues that the TCPA claim abated upon Plaintiff's death.

## II.    Defendant's Motion for Summary Judgment: IIED Claim

### A.    There are Questions of Fact Regarding Whether Defendant's Actions Were "Extreme and Outrageous"

In order to establish a claim of IIED under New York law, "a plaintiff must prove four elements: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection

between the conduct and injury; and (iv) severe emotional distress.'" *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 488 (S.D.N.Y. 2013) (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993)). "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (quoting *Howell*, 81 N.Y.2d at 123).

Defendant relies heavily upon *Conboy v. AT&T Corp.*, 241 F.3d 242 (2d Cir. 2001), where the defendant's representatives "telephoned [the] plaintiffs at their unlisted home telephone number between thirty and fifty times seeking information about [their adult daughter-in-law]'s whereabouts." *Id.* at 247. "The telephone calls were made repeatedly, and some were made at unusual hours." *Id.* However, the Second Circuit determined that the plaintiffs "were not physically threatened, verbally abused, or publicly humiliated in any manner," but were "only harassed with numerous telephone calls from debt collectors." *Id.* at 258-59. As a result, the court held that "[t]his conduct is not so outrageous as to 'go beyond all possible bounds of decency' or to be regarded as 'utterly intolerable in a civilized society.'" *Id.* at 259 (quoting *Stuto*, 164 F.3d at 827).

Defendant seizes upon this language in arguing that because no threats or verbal abuse was present under the instant facts, as a matter of law, Plaintiff cannot prevail on his IIED claim based upon Defendant's repeated telephone calls. (*See* Dkt. 26-1 at 5-6 (arguing that Plaintiff's IIED "claim fails as a matter of law because telephone calls from debt collectors do not rise to the level of outrageousness necessary to support an [IIED] claim")). Plaintiff responds that *Conboy* should not be interpreted so expansively and

offers several cases in support of the proposition that a "planned campaign" of harassing telephone calls can raise a question of fact as to the severity of the conduct involved. (*See* Dkt. 29 at 12-16). Although the federal cases cited by Plaintiff are factually distinguishable in some respects, the Court finds that Plaintiff has successfully raised a question of material fact as to whether Defendant's conduct was "extreme and outrageous."

The Court has jurisdiction to entertain Plaintiff's IIED claim under pendent or supplemental jurisdiction. *See* 28 U.S.C. § 1367(a). "In applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 257 (2d Cir. 1991). Plaintiff points to several New York decisions that stand for the proposition that a planned campaign of harassing calls may constitute extreme and outrageous behavior necessary to support an IIED claim. *See Gill Farms Inc. v. Darrow*, 256 A.D.2d 995, 997 (3d Dep't 1998); *Flatley v. Hartmann*, 138 A.D.2d 345, 346 (2d Dep't 1988); *Long v. Beneficial Fin. Co. of N.Y.*, 39 A.D.2d 11, 13 (4th Dep't 1972); *see also Allam v. Meyers*, No. 09 Civ. 10580 (KMW), 2011 WL 721648, at *8 (S.D.N.Y. Feb. 24, 2011) ("The Appellate Division has also found the existence of a campaign where a defendant made repeated telephone calls to the plaintiff's house only to hang up as soon as someone answered, but where no actual threats appear to have been made." (quotation marks and citations omitted)).

Plaintiff testified that while he received only one call a week during January of 2015, if he did not answer his phone, Defendant's representatives might call back four to eight times until he answered. (*See* Dkt. 29-9 at 7:25-26). In February 2015, Plaintiff began to receive about five to ten calls a day. (*Id.* at 8:31). The telephone calls continued into the

subsequent months, and it was only after Plaintiff filed a complaint with the NYSOAG on June 24, 2015, that the number of calls began to decline. (*See id.* at 9:34). Plaintiff confirmed that he filed his NYSAOG complaint because he had received 24 telephone calls within an 80-minute period on June 19, 2015. (*See id.* at 14-15:79-83; *see also* Dkt. 29-6). Notably, Defendant's July 23, 2015, letter did not deny that Plaintiff received a multitude of calls on June 19, 2015, but instead, indicated Defendant's "regret that [Plaintiff] was subjected to multiple calls by a[] . . . representative." (Dkt. 29-7).

Plaintiff has also submitted a log of telephone calls, purporting to demonstrate that he received at least 331 calls from Defendant between January 2015 and June 2015. (*See* Dkt. 29-8; Dkt. 29-10 at ¶ 3). Although it is undisputed that Defendant's representatives did not threaten, humiliate, or otherwise verbally abuse Plaintiff during these phone calls, Defendant was on notice of Plaintiff's vulnerable condition—stage four esophageal cancer that had metastasized to his brain. (*See* Dkt. 29-9 at 6-7, 19:125). Despite Defendant's awareness of Plaintiff's medical condition, Defendant's representatives continued to call Plaintiff with persistent regularity. Plaintiff testified that he was told that if he could not make his payments, he would lose his automobile, which he relied upon to reach his cancer treatment. (*Id.* at 5:17, 8:30). Plaintiff also testified that he found these calls to be harassing and emotionally disturbing, which only made his struggle with cancer that much more difficult. (*Id.* at 7:27, 9:33-36).

Plaintiff cites to *Hamlett v. Santander Consumer USA Inc.*, 931 F. Supp. 2d 451 (E.D.N.Y. 2013) for the proposition that not all telephone harassment IIED claims are barred by *Conboy*'s holding. (Dkt. 29 at 15-16). In *Hamlett*, the court distinguished

*Conboy* because the number of telephone calls experienced by the plaintiff—9,500 calls within 11 months—far surpassed the 30 to 50 calls that occurred within a month's time in *Conboy*. *Hamlett*, 931 F. Supp. 2d at 457. While these calls involved "threats including false threats of arrest," the court emphasized that the plaintiff also suffered from "mental disabilities" and that the defendant was aware of these disabilities. *Id.*

The instant facts are distinguishable from *Hamlett* since Defendant's representatives did not use obscene or threatening language and the number of calls in *Hamlett* far exceeded the number observed in this case. Plaintiff also cites to two cases from this District, but these decisions are distinguishable for similar reasons. In *Strom v. Nat'l Enter. Sys., Inc.*, No. 09-CV-0072A (F), 2011 WL 1233118 (W.D.N.Y. Mar. 30, 2011), the plaintiff suffered from a "malignant brain tumor" and "advised [the d]efendant that its calls to [him] were stressful and caused [him] to have seizures." *Id.* at *12. However, unlike this case, the phone calls in *Strom* involved abusive rhetoric. *See id.* at *13 ("[T]he court finds that a reasonable jury could conclude [the d]efendant's continued conduct, including calls in which [the p]laintiff was threatened with legal seizure of her [Social Security Disability Insurance] benefits and falsely advised [the p]laintiff of a required court appearance, despite knowledge of [the p]laintiff's brain tumor condition, arises to 'extreme or outrageous conduct.'"). Likewise, in *Herman v. Nat'l Enter. Sys., Inc.*, No. 07-CV-337S, 2009 WL 1874202 (W.D.N.Y. June 29, 2009), the plaintiff experienced "multiple insults regarding her fitness as a mother, insults directed at her son's military service, false representations concerning her criminal liability, unauthorized withdrawals from the

checking account, and other false representations." *Id.* at *2. Such verbal abuse simply did not occur in this case.

*Lundstedt v. Deutsche Bank Nat'l Tr. Co.*, No. 3:13-CV-001423 (JAM), 2016 WL 3101999 (D. Conn. June 2, 2016) is instructive. The plaintiff argued that he suffered from negligent infliction of emotional distress after receiving "'hundreds if not thousands of phone calls'" from his debt collectors. *See id.* at *1. The plaintiff alleged that he suffered from various manifestations of mental and emotional distress as a result of these phone calls. *Id.* Furthermore, the plaintiff also allegedly suffered from "physical and psychological injuries as a result of his service in the military, and that [the] defendants nonetheless engaged in harassing debt collection practices that would foreseeably exacerbate these injuries and cause plaintiff significant distress." *Id.* at *3. The plaintiff claimed that defendant J.P. Morgan Chase Bank ("Chase") had "engaged in an unreasonable, abusive practice of calling him repeatedly" and that this campaign of harassment continued even after "he informed Chase of his existing infirmities and that the calls had damaging psychological effects." *Id.* at *4. The district court stated that "[w]hile it may be an unusual plaintiff who would suffer severe distress as a result of these phone calls, [the] plaintiff here has alleged that Chase had enough information that it should have known him to be vulnerable." *Id.* As a result, the court held that it "cannot conclude, as a matter of law, that making hundreds or thousands of debt-collection phone calls could not lead to an unreasonable risk of serious distress." *Id.*

The Court recognizes that the procedural posture of the instant matter is different from *Lundstedt*, which addressed the defendants' motion to dismiss. However, New York

law recognizes that a "campaign of harassing telephone calls" may raise a question of fact as to whether a defendant's conduct was sufficiently "outrageous" to support an IIED claim, even without the use of abusive language. *See Allam*, 2011 WL 721648, at *8; *Gill Farms Inc.*, 256 A.D.2d at 997; *Flatley*, 138 A.D.2d at 346. Accordingly, the Court finds the rationale in *Lundstedt* to carry equal force in the context of the instant motion for summary judgment.

Here, the Court cannot conclude as a matter of law that Defendant's actions fall outside the scope of "extreme and outrageous conduct" where Defendant called Plaintiff hundreds of times over five months, allegedly with the knowledge of Plaintiff's stage four cancer and the effect the telephone calls were having on Plaintiff's mental and emotional condition. *See Lundstedt*, 2016 WL 3101999, at *3-4; *Gill Farms Inc.*, 256 A.D.2d at 997; *Flatley*, 138 A.D.2d at 346. Although Defendant's representatives did not use threatening or vulgar language, Plaintiff was advised that he would lose his automobile if he did not make timely payments. (Dkt. 29-9 at 8:30). In other words, Defendant's representatives threatened to seize Plaintiff's means of travel for the necessary treatment of his terminal cancer. (*Id.* at 5:17). Defendant was allegedly aware of Plaintiff's vulnerable condition and of the emotional impact its calls were having upon Plaintiff, and yet it continued to call Plaintiff numerous times a day. *Lundstedt*, 2016 WL 3101999, at *4; *see Hamlett*, 931 F. Supp. 2d at 457; *Strom*, 2011 WL 1233118, at *12-13. The Court recognizes that the telephone calls in the instant matter were not so numerous or as egregious as those observed in *Hamlett*. However, the Court finds the *Hamlett* and *Strom* courts' discussion of the plaintiffs' respective mental and physical well-being to be relevant in the disposition of the

instant motion. Given the severity of Plaintiff's terminal condition and Defendant's knowledge thereof, this consideration distinguishes the instant matter from the run-of-the-mill debt collector calls addressed in *Conboy*.

Therefore, the Court concludes that material issues of fact as to whether Defendant's conduct was sufficiently "extreme and outrageous" prevent granting judgment in favor of Defendant on the IIED claim on this ground.

### B.    Defendant's Motion is Denied Without Prejudice on the Ground that Plaintiff Has Failed to Establish "Severe Emotional Distress"

Defendant focuses its IIED summary judgment arguments on the element of "extreme and outrageous conduct." (*See* Dkt. 26-1 at 5-6 (arguing that Plaintiff's IIED "claim fails as a matter of law because telephone calls from debt collectors do not rise to the level of outrageousness necessary to support an [IIED] claim")). However, in a one-sentence assertion, Defendant also claims that Plaintiff cannot satisfy the element of "severe emotional distress" because "he admitted in his deposition that he never discussed [Defendant] with his doctors nor sought psychiatric help as a result of [Defendant]'s phone calls." (*Id.* at 7).

Under New York law, a plaintiff alleging a claim for IIED is "required to establish that severe emotional distress was suffered, which must be supported by medical evidence, not the mere recitation of speculative claims." *Walentas v. Johnes*, 257 A.D.2d 352, 353 (1st Dep't 1999) (citations omitted); *see, e.g., James Biggs v. City of New York*, No. 08 Civ. 8123 (PGG), 2010 WL 4628360, at *9 (S.D.N.Y. Nov. 16, 2010) ("Courts routinely grant summary judgment against plaintiffs where they have failed to present medical

evidence demonstrating severe emotional injury."). Plaintiff defends against this argument by stating that he has "yet to depose witnesses to [his own] emotional distress (his children)," and that he "anticipates obtaining a medical expert to link [his] emotional distress, and some of his physical symptoms to the harassing telephone calls he received." (Dkt. 29 at 16).

"[T]here is no requirement that, before a motion for summary judgment may be granted, all discovery must be complete." *Segreto v. Kirschner*, 977 F. Supp. 553, 556 (D. Conn. 1997). Nevertheless, "[w]hile Federal Rule of Civil Procedure 56 allows a party to move for summary judgment before discovery is complete, such a motion is successful '[o]nly in the rarest of cases' because '[t]he nonmoving party must have had the opportunity to discover information that is essential to [its] opposition to the motion for summary judgment.'" *Great Wall De Venezuela C.A. v. Interaudi Bank*, 117 F. Supp. 3d 474, 492-93 (S.D.N.Y. 2015) (quoting *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000)).

Here, discovery was not complete when Defendant moved for summary judgment, and, in fact, it has been stayed pending the disposition of Defendant's motion. (*See* Dkt. 23 at 2; Dkt. 37). The Court also notes that while Plaintiff did not submit medical evidence of severe emotional distress, he was being treated for various symptoms relating to his stage four cancer during the period he received Defendant's telephone calls. (*See* Dkt. 29-9 at 6-7:23-27). Plaintiff also testified that the calls caused him distress and amplified his symptoms. (*See id.* at 7:27, 9:33-36). While Plaintiff's own emotional distress would normally be within Plaintiff's control and not necessarily something to be pursued in

discovery, this case is arguably different because of Plaintiff's death. Plaintiff's counsel suggests that he would be able to secure a medical expert who could "link Plaintiff's emotional distress, and some of his physical symptoms to the harassing telephone calls he received." (Dkt. 29 at 16). Such evidence would be relevant to Plaintiff's opposition to Defendant's motion for summary judgment as it pertains to his IIED claim.

As a result, the Court concludes that Defendant's one-sentence argument that Plaintiff failed to sufficiently support his claim of "severe emotional distress" with medical evidence has been prematurely raised, and thus, Defendant's motion for summary judgment is denied on this ground, without prejudice.

## III.    Plaintiff's Motion to Substitute

### A.    Legal Standard

As noted above, "[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party." Fed. R. Civ. P. 25(a)(1). "A motion for substitution may be made by any party or by the decedent's successor or representative," but the motion must be made "within 90 days after service of a statement noting the death" or the action will be dismissed. *Id.* In other words, Rule 25 provides for "substitution by another for a deceased party to a civil action if (1) the claim of a deceased plaintiff survives that party's death; (2) the individual seeking to be substituted is a 'proper party;' and (3) the party requesting substitution moves 'within 90 days after service of a statement noting the death.'" *Worrell v. Colvin*, No. 1:12-CV-3386 (ENV), 2013 WL 3364373, at *1 (E.D.N.Y. July 3, 2013) (citation omitted). "The language of Rule 25 is permissive, and '[t]he decision whether to substitute parties lies within the discretion of the trial judge and he may

- 36 -

refuse to substitute parties in an action even if one of the parties so moves.'" *Fishman v. County of Nassau*, No. 10-CV-3231 (MKB), 2013 WL 1339466, at *15 (E.D.N.Y. Apr. 1, 2013) (quoting *Natale v. Country Ford Ltd.*, 287 F.R.D. 135, 137 (E.D.N.Y. 2012)).

## B. Plaintiff's IIED and TCPA Claims Do Not Abate

Under New York law, "[n]o cause of action for injury to person or property is lost because of the death of the person in whose favor the cause of action existed." N.Y. Est. Powers & Trusts Law § 11-3.2(b). As such, Plaintiff's IIED claim does not extinguish upon Plaintiff's death because this cause of action alleges an "injury to person." *See Spagnuolo v. Suffolk County*, No. 12-CV-4327(JS)(AKT), 2017 WL 4326510, at *6 (E.D.N.Y. Sept. 28, 2017) (finding that various state law claims, including "intentional and negligent infliction of emotional distress," did not abate upon the plaintiff's death because "they set forth claims of injury to person or property" (quotation marks and citation omitted)), *appeal dismissed*, No. 17-3563, 2018 WL 2072494 (2d Cir. Mar. 9, 2018); *Regalado v. Kohl's Dep't Stores, Inc.*, No. 13-CV-5624(JS)(AKT), 2015 WL 8481881, at *1 (E.D.N.Y. Dec. 8, 2015) (holding that various state law claims, including "intentional infliction of emotional distress[,] . . . set forth claims of 'injury to person or property,'" and thus, do not abate). Furthermore, for the reasons discussed above, Plaintiff's TCPA claim does not abate because the TCPA claim is primarily "remedial" in nature. *See Colucci*, 603 F. Supp. 2d at 680 ("Unless a statute directly addresses the issue, courts are generally guided by principles of federal common law, which prescribe that claims characterized as 'penal' abate upon a party's death, while claims characterized as 'remedial' survive."); *Hardy v. Kaszycki & Sons Contractors, Inc.*, 842 F. Supp. 713, 718 (S.D.N.Y. 1993)

("Pursuant to federal common law, actions that are penal in nature do not survive the death of a party. Conversely, actions that are remedial in nature generally do survive." (citation omitted)).

### C.   Majewski is a "Proper Party" for Substitution

"It is well established that a proper party under Rule 25 is either a representative of the decedent's estate or the successor of the deceased." *Shapiro v. United States*, No. 07 Civ. 161 (PKL), 2008 WL 4302614, at *1 (S.D.N.Y. Sept. 17, 2008) (citing cases). "Whether a person is a proper 'successor or representative' of the decedent is determined by New York law." *Natale*, 287 F.R.D. at 137 (quotation marks and citation omitted). "To qualify as the representative of the decedent's estate under New York law, the individual seeking substitution must have received letters to administer the estate of the decedent." *Shapiro*, 2008 WL 4302614, at *1. Under New York law, a "personal representative is a person who has received letters to administer the estate of the decedent." *See* N.Y. Est. Powers & Trusts Law § 1-2.13.

Here, Majewski has filed the letters of administration appointing her as the personal representative of Plaintiff's Estate. (Dkt. 30-3). Accordingly, Majewski is a "proper party" for substitution. *See Natale*, 287 F.R.D. at 138 (finding that the "Petition for Probate and Letters of Testamentary" sufficiently established the substitute plaintiff as a proper party for substitution).

### D.   The Motion to Substitute is Timely

Finally, Majewski's motion is timely. The Suggestion of Death was filed on August 23, 2016. (Dkt. 28). Majewski's motion to substitute was filed on August 30, 2016, just

one week later. (Dkt. 30). Accordingly, the motion to substitute was made "within 90 days after service of a statement noting the death" of Plaintiff in satisfaction of Rule 25(a)(1)'s timeliness requirement. Fed. R. Civ. P. 25(a)(1).

Therefore, Majewski's motion to substitute is granted, and Majewski will be substituted, in her capacity as the Administratrix of the Estate of William J. Sharp, as the party plaintiff in the above-captioned action.

## IV. Defendant's Argument in its Supplemental Memorandum is Prematurely Asserted, and Plaintiff's Supplemental Response is Not Properly Before this Court

On July 24, 2017, Defendant filed a motion for leave to submit supplemental briefing addressing the Second Circuit's intervening decision in *Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51 (2d Cir. 2017). (Dkt. 40). In *Reyes*, the Second Circuit held that "the TCPA does not permit a party who agrees to be contacted as part of a bargained-for exchange to unilaterally revoke that consent." *Reyes*, 861 F.3d at 56; *cf. ACA Int'l v. F.C.C.*, No. 15-1211, 2018 WL 1352922, at *18 (D.C. Cir. Mar. 16, 2018) (upholding that part of a Federal Communications Commission ruling "under which a party may revoke her consent through any reasonable means clearly expressing a desire to receive no further messages from the caller," but noting that "[t]he ruling precludes unilateral imposition of revocation rules by callers; it does not address revocation rules mutually adopted by contracting parties"). Defendant argues that Plaintiff consented to receive the subject communications as part of the credit applications he signed when he incurred the automobile loan. (Dkt. 40-2 at 3). Defendant argues that these credit applications are considered binding contracts under New York law, and thus, Plaintiff could not unilaterally

revoke that consent by simply telling Defendant that he did not wish to receive any more calls. (*Id.* at 2-4).

In his July 31, 2017, opposition memorandum, Plaintiff argues that this Court should not consider the *Reyes* decision because it may be reversed *en banc* by the Second Circuit, or the Supreme Court may overturn it. (Dkt. 42 at 2-3). However, the petition for rehearing *en banc* was denied on October 20, 2017, *Reyes v. Lincoln Auto. Fin. Servs.*, No. 16-2104, Docket 126, and review was not sought before the Supreme Court. Thus, any suggestion that judicial economy would be better served by staying the case is moot.

Plaintiff also argues that the Court should not apply *Reyes* until discovery has been completed. As noted above, discovery did not reach a conclusion before Defendant moved for summary judgment. (*See* Dkt. 23 at 2; Dkt. 37). In contrast, it appears discovery was complete when the defendant in *Reyes* moved for summary judgment. *See Reyes*, 861 F.3d at 54.

Furthermore, Defendant makes its argument regarding *Reyes* for the first time in a supplemental brief. (Dkt. 40-2). Of course, Defendant could not have relied upon the *Reyes* decision before it was decided.[3] However, Plaintiff was similarly unaware that Defendant could assert this argument—even while discovery had been taking place. In other words, before discovery was stayed, Plaintiff did not face the prospect of confronting

---

[3] The Court notes that the district court came to the same decision before Defendant filed its motion for summary judgment. *See Reyes v. Lincoln Auto. Fin. Servs.*, No. CV 15-0560, 2016 WL 3453651, at *2-3 (E.D.N.Y. June 20, 2016). Thus, while Defendant could not have relied on the Second Circuit's holding before filing its summary judgment motion, it certainly could have raised the argument in its initial motion papers.

binding Second Circuit precedent on the consent issue now raised by Defendant. Indeed, at least two district court have noted that the Second Circuit's decision in *Reyes* "reflects a potential sea-change in the area of TCPA-litigation." *McBride v. Ally Fin., Inc.*, No. CV 15-867, 2017 WL 3873615, at *2 (W.D. Pa. Sept. 5, 2017); *see Ammons v. Ally Fin., Inc.*, No. 3:17-CV-00505, 2018 WL 3134619, at *14 (M.D. Tenn. June 27, 2018) ("[T]he Court finds that the adoption of *Reyes* by other Circuits would represent a sea change in TCPA litigation in this country.").

Despite Plaintiff's arguments to the contrary, the Court is not convinced that the plaintiff in *Reyes* was not subject to "the sheer volume of calls that [Plaintiff] in this case is believed to have received." (Dkt. 42 at 4); *see Reyes*, 861 F.3d at 54 (noting that the plaintiff had received 141 calls from a customer representative, and 389 calls from pre-recorded messaging systems). However, the Court finds that it would be improper to grant summary judgment at this stage of this litigation without permitting Plaintiff the opportunity to discover information necessary to oppose this newly formed argument. *See, e.g., Great Wall De Venezuela C.A.*, 117 F. Supp. 3d at 492-93. Therefore, Defendant's supplemental argument for the application of *Reyes* is denied without prejudice.

Lastly, Plaintiff raises new arguments in his motion for leave to file a supplemental response that could have been raised in his initial opposition memorandum. It is well-established in this Circuit that new arguments raised in successive briefing papers will not be considered where those arguments could have been raised in a previous submission. *See Patterson v. Balsamico*, 440 F.3d 104, 114 n.5 (2d Cir. 2006) ("This [c]ourt generally will not consider arguments raised for the first time in a reply brief."); *The Res. Mine, Inc. v.*

*Gravity Microsystem LLC*, No. 09-CV-0573 (DRH) (SIL), 2015 WL 8665444, at *3 (E.D.N.Y. Dec. 11, 2015) ("The [c]ourt will not consider any new arguments defendants raised in their supplemental brief . . . because those arguments could have and should have been made at the time of the filing of the original motion papers."); *United States v. Maciejewski*, 70 F. Supp. 2d 129, 137 (N.D.N.Y. 1999) ("Even if the [c]ourt considered these submissions as part of the supplemental papers or as a Reply Brief, 'new arguments may not be made in a reply brief.'" (quoting *The Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999))), *aff'd sub nom. United States v. Best*, 219 F.3d 192 (2d Cir. 2000); *see also Freidus v. ING Groep, N.V.*, 543 F. App'x 92, 93 n.1 (2d Cir. 2013) ("In supplemental briefing, [the plaintiff] raises [an] entirely new argument. . . . We do not entertain this argument because [the plaintiff] could have raised it in the district court, or certainly in his initial brief on appeal and failed to do so.").

The Court agrees with Plaintiff's initial argument that the dismissal of the TCPA claims based upon the holding in *Reyes* would be premature without additional discovery.[4]

---

[4]    The Court notes that the court in *Few v. Receivables Performance Mgmt.*, No. 1:17-CV-2038-KOB, 2018 WL 3772863 (N.D. Ala. Aug. 9, 2018) found that, while discovery had not yet concluded, there was "little merit in forcing [the defendant] to bear the costs of discovery given that [the plaintiff] does not dispute the existence of the contract that precludes her claims under the TCPA." *Id.* at *3. However, as noted above, the Second Circuit has instructed that "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom*, 201 F.3d at 97. Given that Plaintiff disputes the viability of any contractually-derived consent in this case, and since Defendant raised its *Reyes* argument for the first time in supplemental briefing before the close of discovery, the Court declines Defendant's invitation to reach the merits of this contention at this time. Defendant's reliance on *Harris v. Navient Sols., LLC*, No. 3:15-CV-564 (RNC), 2018 WL 3748155 (D. Conn. Aug. 7, 2018) does not warrant a different result. *See id.* CM/ECF Docket No. 39 (ordering that

Plaintiff's assertion that *Reyes* does not apply to the facts of this case due to the nature of the credit applications and the retail installment contract raises new arguments that touch upon the merits of Defendant's *Reyes* contention. (*See* Dkt. 47-1; Dkt. 49; Dkt. 50). These new contentions could have and should have been raised in Plaintiff's initial memorandum in opposition to Defendant's supplemental memorandum. Accordingly, the Court denies Plaintiff's motion to file supplemental briefing, and Plaintiff's motion to seal is also denied as moot. Of course, Plaintiff may raise these arguments in opposition to any subsequent motion filed by Defendant that seeks to apply *Reyes* to the instant facts.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 26) is denied, Plaintiff's motion to substitute (Dkt. 30) is granted, Plaintiff's motion for leave to file a supplemental response (Dkt. 47) is denied, Plaintiff's motion to seal (Dkt. 48) is denied, Plaintiff's motion for leave to cite additional authority (Dkt. 51) is granted, and Defendant's motion for leave to file supplemental authority (Dkt. 53) is granted. The Clerk of Court is directed to substitute Kathleen J. Majewski, in her capacity as Administratrix of the Estate of William J. Sharp, as the party plaintiff in the above-captioned action.

---

fact discovery would be completed by April 19, 2016), Docket No. 56 (motion for summary judgment filed on September 23, 2016).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:    September 10, 2018
           Rochester, New York